**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 15-cr-468 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| TREMAYNE THOMPSON. | ) | |

**MEMORANDUM OPINION AND ORDER**

On March 6, 2015, Defendant Tremayne Thompson was arrested after a parole agent found a firearm at the residence where he was living. A grand jury later indicted him on a charge of possession of a firearm by a felon. Defendant filed a motion to suppress [37] seeking to exclude evidence of the discovery of the firearm on the grounds that (1) the search exceeded the scope of the consent that he provided in his parole agreement and (2) the agents failed to obtain consent to the search of the specific room where the gun was found. For the reasons stated below, Defendant's motion to suppress [37] is denied.

**I.  Background**

The Seventh Circuit has described "the resolution of a motion to suppress" as a "fact-intensive inquiry" in which the district court must make "credibility determinations" based on "its opportunity at the suppression hearing to hear the testimony and observe the demeanor of the witnesses." *United States v. Kempf*, 400 F.3d 501, 503 (7th Cir. 2005); see also *United States v. Springs*, 17 F.3d 192, 194 (7th Cir. 1994) (explaining the deference given to the credibility determinations of the district judge who has "heard the conflicting testimony, observed the witnesses, and then reached a determination about whom to believe"). Here, the Court held a hearing at which both sides presented testimony and after which the parties provided

supplemental briefing on the legal issues relating to the warrantless search that led to the confiscation of the firearm in question.

As the testimony and documents presented at the evidentiary hearing showed, in anticipation of his release from the physical custody of the Illinois Department of Corrections, Defendant signed a Mandatory Supervised Release Agreement ("MSR Agreement") in December 2012. The MSR Agreement set out the terms of his conditional release from confinement. Transcript at 23-27; Govt. Ex. IDOC MSRA. Those terms required Defendant to consent for the duration of his term of supervised release to searches of his person, property, or residence under his control, which the state agents interpret to include any location where the parolee is not "locked out." Transcript at 19-20, 26; Govt. Ex. IDOC MSRA. Assent to these terms is not optional; absent compliance, parolees remain in custody. Transcript at 20-21. In addition to signing the MSR Agreement prior to his release from custody, Defendant was provided a copy of the Project Safe Neighborhoods form, which advised that he could not possess a weapon. Transcript at 27-31; Govt. Ex. PSN-Form. In short, the record clearly establishes that, at the time of his release, Defendant was aware that (1) he could not possess a weapon and (2) he would be subject to periodic searches of his residence during his term of supervised release.

On Christmas Eve 2012, Defendant was released on parole. His release plan and reporting instructions indicated that he was to live at an aunt's house in Dolton, Illinois. Transcript at 31-34; Govt. Ex. IDOC-Reporting Instructions; Govt. Ex. IDOC - History Report. A little more than a year later, during a search of a different location that Defendant had designated as his address, agents learned that Defendant was living with a girlfriend at another address. Transcript at 36-39; Govt. Ex. IDOC - History Report. About a week later, after

Defendant was advised that he could not have a "parole address" separate from his actual residence, Defendant contacted parole officials and changed his residence to 421 S. Kilbourn Avenue, Apartment 1, Chicago, Illinois, 60624, and listed a phone number for Shalonda Stewart. Transcript at 42-43; Govt. Ex. IDOC - History Report. As the testimony at the hearing establishes, Ms. Stewart was Defendant's girlfriend at the time of the search in question. Transcript at 101.

On March 6, 2015, agents arrived at the residence on Kilbourn Avenue to conduct a search. Transcript at 42-43, 74-75, 78, 102. The agents knocked on the door for several minutes without anyone coming to the door. *Id.* at 45, 79, 102. Agent Tweedle then called Defendant and told him that parole agents were outside and Defendant had to let them enter. *Id.* at 46, 79. Defendant complied. *Id.* at 46-47, 79, 102. Once inside, agents asked Defendant where he slept and were directed to an upstairs bedroom. *Id*. at 49, 80, 82. According to the agents, Defendant stated that he had access to the entire residence and said words to the effect of, "Search where you want, I know the drill." *Id*. at 47.

Agent Tweedle proceeded to the large, walk-in closet inside the master bedroom and began to search. Transcript at 49. Agent Tweedle remembered the closet from a prior search of Defendant's residence. *Id*. He found no contraband. *Id*. at 50. While in the master bedroom, Agent Tweedle looked across through a short hallway to a second bedroom (*id*.), which Ms. Stewart identified as her 6-year old daughter's bedroom (*id*. at 104, 116). Agent Tweedle observed Ms. Stewart standing in the door to that bedroom, with her right hand up to the right and her left hand down to the left. *Id*. at 50, 52. Based on his experience and Ms. Stewart's body language, Agent Tweedle believed that she was "protecting" that area. *Id.* The door to that bedroom was wide open and no keys were needed to gain access to the room. *Id.* at 48-52.

3

Agent Tweedle approached Ms. Stewart and told her he needed to check that room. *Id.* at 51-52, 115. Ms. Stewart did not tell the agent not to go into that room, but instead moved out of the way and Agent Tweedle entered the room. *Id.*

Once inside the bedroom, Agent Tweedle proceeded to the closet, where he saw a black cloth bag. Transcript at 53. When he opened the bag, he observed an "Uzi-type weapon" on top of men's clothing. *Id.* at 53, 55, 88-89; Govt. Ex. Photo Gun - 1. Agent Tweedle protected the firearm with his body and radioed Task Force Officer Colvin. Transcript at 53, 55, 84. After Officer Colvin arrived in the room, the officers tried to determine whether the gun was loaded. *Id.* at 86. After taking a photo of the firearm in the bag, Officer Colvin detached the magazine and racked the slide several times to see if a live round would eject from the chamber. *Id.* at 86-87; Govt. Ex. Photo Gun - 2. He then took a ballpoint pen and placed it in the chamber to ensure that it would not fire. Transcript at 87. Officer Colvin later removed all of the items from the black cloth bag to see whether there was another firearm and determined that the bag contained men's clothing, including a pair of boxer shorts, and the recovered 9mm firearm with a 36-round extended magazine loaded with seven live rounds. *Id.* at 87-88; Govt. Ex. Photo Gun - 1. Before leaving the apartment, agents searched everywhere in the house except for a locked bedroom. Transcript at 19-20, 84, 94-96, 104, 108. Apart from drug paraphernalia from the same closet, no other weapons or other contraband was located. *Id.* at 57.

**II.     Discussion**

In *Samson v. California*, 547 U.S. 843, 847 (2006), the Supreme Court addressed "whether a condition of release can so diminish or eliminate a released prisoner's expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment." The Court answered that question in the affirmative in an opinion that sets out the

proper framework for considering the reasonableness of the search at issue here. At the highest level of generality, a court must "look at the totality of the circumstances, balancing the degree to which the search intrudes on individual liberty and the degree to which it promotes legitimate governmental interests." *United States v. White*, 781 F.3d 858, 862 (7th Cir. 2015).

Here, as in *Samson* and *White*, the critical factor in assessing the degree of intrusion on individual liberty is Defendant's "status as a parolee." *White*, 781 F.3d at 862. Parolees remain "on the 'continuum' of state-imposed punishments," and thus have "fewer expectations of privacy in general." *Id*. at 863 (quoting *Samson*, 547 U.S. at 850). And "[t]hose reduced expectations are diminished further where, as here, a condition of parole requires the parolee to submit—unconditionally—to searches of his person, property, and residence." *Id*. On the other side of the equation, both the Supreme Court and the Seventh Circuit have recognized the government's "overwhelming interest" in supervising parolees "because they are more likely to commit crimes and must be reintegrated into the community." *Id*. at 862 (quoting *Samson*, 547 U.S. at 853).

Defendant concedes that pursuant to the MSR Agreement he had consented to a search of the portion of his residence "under his control," pointing to both the language of the agreement itself and an Illinois statute, 730 ILCS 5/3-3-7(a)(10), as limiting the scope of a proper search to areas under a defendant's control. Defendant then points to Ms. Stewart's testimony at the evidentiary hearing to support the contention that he did not have control over the room in which the gun was found.

Taking into account the "totality of the circumstances," Defendant's contention that the agents unreasonably exceeded the scope of a proper search under the terms of the MSR Agreement and the pertinent case law is unavailing. To begin, Ms. Stewart's testimony stopped

well short of establishing that any area of the apartment was somehow off limits to Defendant or outside of his control. Defendant candidly acknowledges that Ms. Stewart's testimony "is not a model of precision" [79, at 3], and the responsibility for clearing up any ambiguities cannot be laid at the feet of counsel for the Government. The Court cannot divine what her testimony "was intended to convey" (*id*.), and nowhere did she actually say that Defendant's access to all rooms in the apartment was limited in any way. Beyond that, common sense strongly suggests otherwise. Defendant himself provided Ms. Stewart's apartment as his address more than a year before the search in question took place. Agents previously had conducted compliance searches at the premises. It is undisputed that Defendant lived at that location with Ms. Stewart and her two minor children, who were 10 and 6 at the time. Defendant admits in his reply brief [79, at 9] that at the time of the search, Ms. Stewart was his "significant other" and that "they saw themselves as a family unit." It would be strange indeed for an adult to be restricted in his movements at a location where he had been living for fourteen months as part of a "family unit." Moreover, the other contents of the bag in which the gun was found—men's clothing—further undermine any suggestion that Defendant lacked access to the room, as he was the only adult male living on the premises.

Whether the agents were correct in believing that any unlocked door was fair game—an issue that the Court need not address at this time[1]—the totality of the circumstances shows that the unlocked bedroom searched here was within the scope of the consent provided by the MSR Agreement. If that were not the case, a person in Defendant's position could easily evade the terms of the MSR Agreement and the federal law ban on felons possessing a firearm by simply moving the gun to a child's bedroom between the time that agents knocked and the time that they

---

[1] The Court also need not decide whether, given the totality of the circumstances, agents would have possessed authority to direct Defendant to unlock any locked doors to which he had keys.

were permitted to enter. In all likelihood that is exactly what transpired on the morning that the agents seized the gun at issue here. To conclude otherwise, one would have to believe that Defendant and Ms. Stewart—the only adults living at the apartment—would store a loaded firearm (and drug paraphernalia) in a 6-year old child's bedroom. In short, on the record before the Court, any suggestion that the search of the bedroom where the gun was found was not authorized by the MSR Agreement or the controlling Fourth Amendment jurisprudence is misplaced. Defendant plainly had access to and control over every room that the agents searched, and thus there is no basis to suppress the evidence that they collected, including the loaded gun.[2]

### III. Conclusion

For the reasons stated above, Defendant's motion to suppress [37] is denied. This case remains set for further status hearing on June 6, 2018 at 9:00 a.m.

Date: March 5, 2018

Robert M. Dow, Jr.
United States District Judge

---

[2] Given the Court's conclusion that the search was reasonable under the Fourth Amendment and the MSR Agreement because Defendant had access to and control over the bedroom where the firearm was found, the Court need not address the remaining arguments concerning the Defendant's or Ms. Stewart's consent (or lack thereof) to search the bedroom.